**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

In re:                                                                    | NOT FOR PUBLICATION

919 PROSPECT AVE LLC,                                    | Chapter 11

                                              Debtor.       | Case No. 16-13569 (SAB)

-----------------------------------------------------------X

## MEMORANDUM OF DECISION AND ORDER SETTING FORTH
## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this contested matter, contractor Ap Tek Restoration Inc. ("Ap Tek") seeks an order declaring that Ap Tek "has no further obligations to the Debtor" under a settlement agreement (styled as a so-ordered stipulation, *see* ECF No. 237, the "Settlement Agreement"), and therefore "certain monies being held in escrow may be released." *See* ECF No. 266, the "Motion." Ap Tek, which was hired to perform renovations on the Debtor's building, filed the Motion on February 28, 2023; the Debtor objected to the Motion on March 28, 2023 (ECF No. 267, the "Opposition"); and on March 9, 2026, Ap Tek filed an Affidavit of Shan Bhutta in Support of Motion for Release of Escrow Funds as well as an Affidavit of Shan Bhutta in further support of Motion for Release of Escrow Funds. ECF Nos. 298, 299 (collectively, the "Reply"). This Court held an initial hearing on March 10, 2026 (the "Hearing"),[1] and an evidentiary hearing on June 30, 2026 (the "Trial"). The parties submitted pre-trial memoranda of law (ECF Nos. 314, 315) and post-trial memoranda (ECF Nos. 322, 323). Because Ap Tek's performance under the Settlement Agreement was not impossible or prevented by the Debtor and therefore Ap Tek's breach of the Settlement Agreement was not excused. For these reasons, and as set forth more fully below, the Court **DENIES** Ap Tek's Motion and authorizes reversion of the escrow funds to the Debtor.

---

[1] Because the parties did not order a transcript of the March 10, 2026 hearing, the Court has omitted citations to the record for that proceeding below.

**JURISDICTION**

This Court has jurisdiction over the chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2).  Given that this contested matter originates from a claim dispute concerning the chapter 11 estate, the Court has the power to enter a final order resolving this matter.  *Stern v. Marshall*, 564 U.S. 462, 496-97 (2011).

**PROCEDURAL HISTORY AND RESOLVED ISSUES**

This Memorandum of Decision sets forth the Court's findings of fact, conclusions of law, and rulings on the remaining issues in this contested matter after a one-day trial and reflects the Court's review of the Trial record as well as the parties' post-trial proposed findings of fact and conclusions of law.  *See* ECF Nos. 322 (Debtor), 323 (Ap Tek).

This Trial is born out of a tortured history between two parties dating back to early 2020. Relevant here, the Debtor's estate includes the real property located at 919 Prospect Avenue, Bronx, NY 10459 (the "Property").  On December 22, 2016, the Debtor filed a voluntary petition for relief from its creditors pursuant to chapter 11 of the Bankruptcy Code.  ECF No. 1, the "Petition."  Thereafter, the Office of the United States Trustee appointed an operating trustee of the Debtor, Ian Gazes, who oversaw construction of the Property (the "Operating Trustee").  ECF No. 39 (Order Approving Appointment of Chapter 11 Trustee).  Mr. Gazes hired Ap Tek, a general contractor, which guided major renovations of the Property.  ECF No. 322, "Debtor's Post-Trial Mem. of Law" ¶ 1.  After many years of work, and confirmation of the Debtor's plan of reorganization, the Operating Trustee turned over control to the Debtor in March of 2019.  *Id.* ¶ 3. Shortly thereafter, an administrative bar date was imposed by this Court pursuant to which Ap Tek filed its administrative claim in the total amount of $224,749.00.  *Id.* ¶ 4.  The Debtor filed an objection to the administrative claim (ECF No. 231, the "Claim Objection").  *Id.*

2

The parties entered into the Settlement Agreement to resolve the Debtor's Claim Objection, which was so-ordered by the Court on August 31, 2020. *See generally* Settlement Agreement. Under the terms of the Settlement Agreement, the administrative claim amount was reduced to $140,000 payable in three (3) equal installments of $46,666.67, with $50,000 to be retained in escrow, "pending issuance of the approvals of the work under the permit by DOB." *Id.* ¶ 2(b)(iv). The Trial in this matter relates specifically to Ap Tek's performance under Section 2(c) of the Settlement Agreement, which provides in relevant part that: "The Claimant, through its principal(s), shall fully cooperate with the Reorganized Debtor in providing "sign-offs" and/or any and all authorizations on any open building permits within the New York City Department of Buildings and any other governmental agency which were part of the work set forth in the contracts with the Operating Trustee and/or included in the Administrative Claim, as well as any required extensions to those permits at no additional cost to the Reorganized Debtor, except the Reorganized Debtor shall pay any fee to extend the time of the permit."

On February 28, 2023, Ap Tek filed the instant Motion, seeking a determination that the funds currently being held in escrow should be released to it, notwithstanding its failure to provide certain permits otherwise required under the Settlement Agreement. *See generally* the Motion. While the dispute has since been narrowed to a single permit (described below), the Claim Objection initially asserted that there had not been "any final sign off by the City of New York Department of Buildings" on any of "the Building permits that [Ap Tek] obtained for the work," and that Ap Tek had "neglected to renew one of the permits on the job," resulting in a stop work order for over six months. Claim Objection ¶¶ 6, 14. Ap Tek responded, contending that the DOB did not sign off on the disputed permits because the gas line work, included on the permits, was not "part of [Ap Tek's] job" and instead required an architect's involvement. ECF No. 232

3

(Response to Claim Objection).  The Settlement Agreement later memorialized all the foregoing permit obligations, stating that Ap Tek had to fully cooperate in providing sign offs on "any open building permits," but explicitly singled out one: "the permit that [Ap Tek] represented in court that it renewed but which actually lapsed."  Settlement Agreement ¶ 2(c).  The escrow provision also conditions the release of funds on the same permit: "$50,000.00 . . . shall remain in escrow pending issuance of the approvals of the work under the permit by DOB."  *Id.* ¶ 2(b)(iv).  The permit is an Alteration Type 2 permit for the renovation of twenty-two apartments (the "Permit").  ECF No. 314, the "Debtor's Pre-Trial Mem. of Law" p. 2, 6; ECF No. 315, "Ap Tek's Pre-Trial Mem. of Law" ¶ 4; Exhibit O.  Likely because the release of the escrowed funds turns on DOB approval of this Permit, the parties focused their dispute on this Permit alone.  *See* Debtor's Post-Trial Mem. Of Law p. 2; Ap Tek's Post-Trial Mem. Of Law ¶ 9.

The Debtor opposed the Motion in March 2023.  *See generally* the Opposition.  Nevertheless, due to a series of procedural complications, a hearing was not held on the Motion until March 10, 2026.  *See* ECF No. 297 (Notice of Hearing).  More specifically, among other things, Ap Tek's counsel withdrew in October 2025.  *See* ECF No. 287 (Order Granting Motion to Withdraw).  At that time, the Honorable John P. Mastando III cautioned Ap Tek's principal ("Shan Bhutta") that he would have to procure counsel prior to their previously set trial date of January 7, 2026.  ECF No. 296 (Status Report) p. 3.  But Ap Tek's principal did not obtain counsel by that date and, instead, attempted to appear at the January 7, 2026 trial *pro se*.  *Id.*  The Court explained to Mr. Bhutta that a notice of appearance had to be filed on his behalf by no later than January 22, 2026, as a corporation cannot appear *pro se* and the failure to appear through counsel would otherwise constitute a default.  *Id.*  Karamvir Dahiya then filed a notice of appearance on behalf of Ap Tek on January 21, 2026, on the eve of the deadline for Ap Tek to retain a lawyer.

4

ECF No. 293 (the Notice of Appearance).  On February 6, 2026, the instant case was transferred

to this Court, and the Court agreed to hear the Motion relating to performance under the Settlement

Agreement on March 10, 2026.  ECF Nos. 294 (Notice of Case Reassignment), 297 (Notice of

Hearing).  Late in the evening prior to the Hearing (and unannounced), Ap Tek filed a Reply in

further support of the Motion.  *See generally* Reply.

Then, at the Hearing, Ap Tek informed the Court that, for the first time in the case, it had

decided that limited discovery was warranted, including third-party discovery directed to the New

York City Department of Buildings contending that a more developed documentary record would

help support its case.  The Debtor countered that the record already contained all of the papers

relevant to the dispute and that no further discovery was necessary.  The Debtor further argued

that, separately, the Motion could be decided on the papers already before the Court, but that in

light of the years of delay detailed in its Opposition, it believed it was entitled to damages.  The

Court inquired whether the parties saw any potential for settlement, and both sides confirmed that

none existed.  Given that impasse, the parties agreed to proceed to trial on the merits of the Motion

and estimated that trial would take no more than a few hours.  The Court advised that it would

issue a pretrial schedule following the Hearing and, given the protracted history of the dispute,

would not entertain further delay absent good cause shown.  Pursuant to that Scheduling Order,

the matter was deemed a contested matter and made the entirety of Federal Rule of Bankruptcy

Procedure 9014 applicable to the proceeding.[2]  ECF No. 300 (Scheduling Order) ¶ 1.  The limited

discovery sought by Ap Tek was then scheduled to close on June 2, 2026.  *Id.* ¶ 2.

---

[2] At the Hearing, the Court asked the parties whether this matter should instead proceed as an adversary proceeding. Both parties responded that an adversary proceeding was not necessary, with counsel for Ap Tek further arguing that an adversary proceeding would not be appropriate.

On May 19, 2026, this Court set a final pretrial schedule, pursuant to which the parties were directed to appear for a final pretrial conference on June 23, 2026.[3]  ECF No. 303 (Final Pretrial Scheduling Order) p. 1.  One week prior to that date, the parties were ordered to meet and confer and submit a proposed joint pretrial order.  *Id.*  On June 1, 2026, the day before discovery was set to close, Ap Tek's principal (Shan Bhutta, not a lawyer) submitted an *ex parte* email to Chambers, explaining that he needed more time to hire an attorney for his case.  ECF No. 304 (Email).  The Court caused that email to be filed on the docket.  *Id.*  As the Debtor correctly pointed out in a subsequent status letter, Mr. Dahiya had not filed a motion to withdraw as counsel and the Court had not otherwise granted Mr. Dahiya, the attorney of record on behalf of Ap Tek in this case, leave to withdraw and so Ap Tek continued to be represented by counsel (Mr. Dahiya).  ECF No. 305 (Letter in Response to Email), at 1.

On June 16, 2026, Mr. Dahiya contacted the Court for a return date for a motion to withdraw as counsel, which he then filed on shortened notice.  ECF No. 307, the "Motion to Withdraw."  Then, on June 16, 2026, as required by this Court's Final Pretrial Scheduling Order (ECF No. 303), Debtor's counsel ("Mr. Rosen") submitted a proposed final pretrial order to Chambers.  Counsel for Ap Tek, whose Motion to Withdraw had just been filed but had not yet been granted, failed to make the required filing on that date.  The next day, on June 17, 2026, the Court entered an Order confirming that the final pretrial conference was to proceed as scheduled on June 23, 2026, scheduling Mr. Dahiya's Motion to Withdraw for the same date, and ordering Ap Tek by the end of the day on June 18, 2026, to either (i) show cause as to why it should not be precluded from calling affirmative witnesses and introducing evidence on direct other than was

---

[3] There are no citations for events that transpired at the June 23, 2026 pretrial conference because no transcript of the June 23, 2026 pretrial conference exists.

6

already contained in the Debtor's pretrial submission, or instead (ii) to just file its exhibit and witness lists. *See* ECF No. 309 (Scheduling Order). Ap Tek did not respond in any way.

**June 23, 2026 Pretrial Conference**

On June 23, 2026, the Court held a hearing on the Motion to Withdraw and the final pretrial conference. The Court denied Ap Tek's Motion to Withdraw, concluding in relevant part that Mr. Dahiya's withdrawal would cause undue prejudice to both his client and the Debtor given that the claim had been pending for more than three years and the matter was on the eve of trial for the third time. ECF No. 311 (Order Denying Motion to Withdraw). In his Motion to Withdraw, Mr. Dahiya asserted that Ap Tek had effectively discharged him as counsel and that he lacked the requisite expertise to effectively litigate the present dispute. Mot. to Withdraw ¶¶ 6-7, 12-13. In denying the Motion to Withdraw, the Court noted that the dispute was the same as when Mr. Dahiya initially appeared, so it was not clear why Mr. Dahiya suddenly contended he lacked the expertise to litigate the dispute (which, after all, was a straight-forward breach of contract with a limited factual record). However, even crediting that Mr. Dahiya was initially unfamiliar with construction-related permitting issues, he had ample opportunity (more than three months, from his January 21, 2026 appearance through the March 10, 2026 hearing and beyond) to familiarize himself with the substantive issues before belatedly raising incompetence as a basis for withdrawal. Crucially, however, the timing and substance of the Motion to Withdraw independently counseled against granting it. Mr. Dahiya sought to withdraw on the eve of trial, a step that would have left his client, a corporation ineligible to proceed *pro se*, without representation on the brink of a long-delayed trial date, working a severe prejudice to Ap Tek itself. Crediting Mr. Bhutta's communications to the Court (however improper), it was also clear

7

that Mr. Bhutta did not have access to alternative counsel and did not believe he himself could locate counsel. *See* ECF No. 310 (Email).

After denying Mr. Dahiya's Motion to Withdraw, the Court conducted a final pretrial conference. During the final pretrial conference, Mr. Dahiya disclosed that he had not conducted any discovery despite having previously insisted on a delay in the trial of this matter to allow him to conduct discovery. Further, Mr. Dahiya offered no reason as to why he had not cooperated with the Debtor's counsel to compile a joint final pretrial order and, in fact, noted that he had not even reviewed the Debtor's submission (which appeared to contain all of the evidence and witnesses that Mr. Dahiya had previously identified as relevant to his case-in-chief).[4] *See* ECF No. 303 (Scheduling Order) (ordering the parties to submit "a proposed joint pretrial order to Chambers (barday.chambers@nysb.uscourts.gov) no later than June 16, 2026 at 10:30 a.m. (Eastern Time), in Word format"). Mr. Dahiya likewise did not have any explanation for why he failed to respond to the Court's June 17 Order. Accordingly, the Court ordered that Ap Tek was precluded from introducing any exhibits or calling any affirmative witnesses in its direct case at trial ***unless the exhibits or witness names were already contained in the Debtor's exhibit and witness lists***. ECF No. 312 (Amended Scheduling Order). At the same time, the Court granted Mr. Dahiya time to review the Debtor's proposed witness and exhibit lists (since he had not done so ahead of the final pretrial conference), to meet and confer with Debtor's counsel so that he could raise any legal issues regarding the witness and exhibit lists by letter to the Court no later than June 26, 2026. *See id*. The parties therefore met and conferred, narrowed the witness lists and then notified the Court on June 26, 2026, that they would not require any emergency conference on the proposed evidence

---

[4] Originally, the Court could not discern whether the parties had conferred regarding Mr. Rosen's submission because the proposed final pretrial order submitted by Mr. Rosen included exhibits historically favorable to each party with regard to the dispute at hand. Mr. Rosen later clarified that he had in fact intended to be as comprehensive as possible, despite Ap Tek's absence in the pretrial processes.

8

because they had come to an agreement on both the witness and exhibit lists. ECF No. 313 (Letter Regarding No Need for Conference).

The parties then submitted their pre-trial memoranda of law on June 29, 2026, one day before trial. ECF Nos. 314, 315. These memoranda revealed a discrepancy between the parties' understanding of the governing standard and, with it, the burden of proof. *See* Debtor's Pre-Trial Mem. of Law ¶ 25*;* Ap Tek's Pre-Trial Mem. of Law p. 5-6. The Debtor argued that Ap Tek was "seeking relief from a court ordered stipulation" governed by Federal Rule of Bankruptcy Procedure 9024, which renders Federal Rule of Civil Procedure 60(b) applicable in a bankruptcy case. Debtor's Pre-Trial Mem. of Law ¶ 25. Under this standard, the Debtor argued that the burden of proof was on the party seeking relief (*i.e.*, the movant, Ap Tek), and that such party must show "extraordinary circumstances" to justify said relief. *Id.* (citing *Nemaizer v. Baker*, 793 F.2d 58, 63 (2d Cir. 1986)). Ap Tek, instead, sought to "enforce . . . not to vacate" the Settlement Agreement, and therefore contended that both Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b) were "inapposite." Ap Tek's Pre-Trial Mem. of Law p. 5. Rather, Ap Tek framed the issue under contract law principles, namely the doctrine of prevention of performance. *Id.* p. 6. The Court agrees that the instant Motion is properly analyzed under contract law principles, though Ap Tek's Motion must be denied under either standard.

### June 30, 2026 Pretrial Conference

In light of the foregoing, the Court held a pretrial conference prior to opening the Trial on June 30, 2026, in order to determine whether any issues had been resolved between the parties, including whether the question of who bore the burden of proof was still outstanding. Mr. Dahiya set forth a number of arguments relating to how the Trial should proceed, including without limitation: first, he stated that his inability to introduce exhibits and witnesses was unfair (Tr. 5:9-

8:21) and stated that he wanted to offer a proffer; second, the Debtor should have to present its case first (Tr. 12:1-11); and third, the issue of damages should not be litigated at Trial because the damages was a matter that necessarily had to be raised in an adversary proceeding, which this contested claim proceeding was not (Tr. 12:12-19).  As to the first issue, the Court again explained to Mr. Dahiya that he had every opportunity to participate in discovery and the pretrial proceedings and elected not to and, in fact, he was not precluded from presenting a case on direct but was only limited in presenting new exhibits or new witnesses—even then, the limitation was on the affirmative case only and did not preclude, for example, the presentation of a rebuttal witness (though since the Debtor's pretrial submissions, both the witness and exhibit lists, contained Ap Tek's witnesses and exhibits, it was not clear what additional documents or witnesses were even arguably necessary and counsel for Ap Tek identified none).  Tr. 6:3-7:21, 13:19-17:4.

Mr. Dahiya then purported to make a motion under Federal Rule of Evidence 103(a)(2) to present an offer of proof, asserting that the preclusion order left Ap Tek without any means of carrying its burden.  Tr. 19:23-20:13.  The Court then asked Mr. Dahiya directly what documents he believed had been wrongly excluded.  Tr. 21:7-8.  Mr. Dahiya responded only in general terms, referring to unspecified emails relating to an architect and an "exchange" that a witness whose name is unclear from the record only could have produced.  Tr. 21:9-13.  Counsel for the Debtor responded that, to his knowledge, the exhibits already before the Court encompassed the relevant universe of communications, including documentation of the architect's payment that Ap Tek itself had placed at issue, identifying Exhibits I, J, K, and M, in relevant part.  Tr. 22:9-23:8.  Mr. Dahiya indicated that he disagreed and then produced, for the first time, a new binder of materials.  Tr. 29:9-25.  Under questioning from the Court regarding what was contained in the binder, none of the materials contained therein fit the description of what Mr. Dahiya seemed to be referring to:

10

what he had identified as "invoices" proved to be Ap Tek's own invoices, already resolved as part of the Settlement Agreement negotiations, and what he identified as correspondence with the architect (marked Exhibit N) proved, on inspection, to be correspondence between counsel and the Court concerning prior adjournments of this matter—not communications with any architect at all. Tr. 30:9-33:25. When the Court and Debtor's counsel searched, page by page, through marked Exhibit C for the promised architect correspondence, none could be found; both the Court and Mr. Rosen confirmed the architect was "not anywhere" in that exhibit, which consisted instead of attorney-client communications between Mr. Dahiya and Ap Tek's prior counsel, largely predating the Settlement Agreement. Tr. 35:24-36:25. Mr. Dahiya confirmed that none of these materials had been produced in discovery or disclosed to the Debtor before that day. Tr. 37:2-20. Asked once more where the architect correspondence could be found, Mr. Dahiya could not identify any and stated he was "going to move on." Tr. 38:13-39:3. The Court also asked Ap Tek which documents and/or witnesses it felt were instrumental to its arguments but that had been omitted from the Debtor's pretrial submission. Tr. 29:9-12. Mr. Dahiya was unable to identify any and eventually stated he had "nothing else to say" and he withdrew his proffer. Tr. 40:4-9.[5]

After addressing these arguments, the Court explained that based on the reading of the parties' pretrial memoranda, it appeared the parties at least agreed that Ap Tek had breached the Settlement Agreement and asked the parties whether the question of breach was, in fact, conceded or not.[6] Mr. Dahiya confirmed that his client was conceding that it had breached the Settlement

---

[5] Regarding the second issue, the Court denied Ap Tek's belated request on the morning of trial pursuant to Federal Rule of Evidence 611. Tr. 16:18-22. Finally, as to the question of damages, the Court observed at the pretrial conference immediately preceding Trial, the reason the parties were proceeding to an evidentiary hearing at all was that Mr. Rosen, in opposing the Motion, had requested one. Tr. 13:9-19. The Court further noted that Ap Tek's contention that it lacked notice of the damages claim was undermined by the fact that the claim had been on the docket, and the subject of the Debtor's opposition to Ap Tek's own Motion, for more than three years. Tr. 14:6-15.

[6] While Ap Tek expressly conceded breach at the outset of Trial, it later appeared to oscillate on that point hours into Trial. Tr. 7:24-8:7. However, Ap Tek remained steadfast in its reliance on the doctrine of prevention of performance to excuse its nonperformance, which as a matter of law requires the party seeking excuse to have breached in the first

11

Agreement, and testimony at Trial made clear that the agreement required the renewal of a permit that was never renewed and therefore there had been a breach of the Settlement Agreement.

**June 30, 2026 Trial**

Two witnesses appeared on the Debtor's exhibit and witness list after the meet and confer with Ap Tek: Shan Bhutta (Ap Tek's principal) and Seth Miller (managing member of the Debtor). On the morning of Trial, set to begin at 10:00 a.m. (Eastern Time), the Court received a notice from Mr. Rosen, that Mr. Miller's original international flight had been cancelled and while he had managed to obtain a seat on another flight, he would not be able to testify until midday.  In light of the anticipated brevity of Trial, and with the consent of Ap Tek, the Court granted an adjournment to 12:30 p.m. (Eastern Time).  Contrary to the parties' expectations that Trial would last only a few hours, Trial in fact ran more than six hours, consisting of the testimony of two witnesses and spanning nearly twenty exhibits (seventeen had appeared on the pretrial submission).  After brief opening statements from Ap Tek and the Debtor, Mr. Dahiya called Shan Bhutta, Ap Tek's principal, to the stand.

*Shan Bhutta Direct Examination.*  Mr. Bhutta testified that he has worked in construction for over twenty-two years and has run Ap Tek, a general contracting business performing renovation work, for the same period.  Tr. 57:12-21.  He testified, however, that he was not personally familiar with the New York City Department of Buildings' permitting process, explaining that "everything [was] done by the architect."  Tr. 57:24-58:1.  He testified that once the Permit at issue lapsed, he attempted to contact the architect of record by phone and email, without success, and that when the architect eventually responded, he stated that he had outstanding invoices and was "not working for [the owner] anymore."  Tr. 70:8-12, 71:17-72:3,

---

instance.  Tr. 77:17-78:20; *see Kooleraire Serv. & Installation Corp. v. Board of Educ. of City of N.Y.*, 28 N.Y.2d 101, 106 (1971).

87:16-25.   Mr. Bhutta did not testify that he offered to pay the architect at that time, notwithstanding a provision of the Settlement Agreement requiring the renewal of the permit to be done at no additional cost to the Debtor other than the price of the renewal fee.  Nevertheless, Mr. Bhutta testified, categorically and repeatedly, that a permit renewal, whether of an active or expired permit, can only be accomplished by an architect, who prepares the application, which Ap Tek then merely signs, notarizes, and returns.  Tr. 71:9-11, 79:20-80:1, 80:14-21.  He testified that he lacked any authority to retain, direct, or substitute the architect, had no role in the underlying gas piping work performed by a prior contractor, and that he could neither renew nor close out the Permit without an architect's sign-off under any circumstances.  Tr. 72:1-3, 82:23-83:24, 95:16-19.  Asked what, in his view, prevented DOB approval from issuing, Mr. Bhutta testified simply: "Architect never [made] the request to the Department of Building."  Tr. 104:24-105:9.

*Shan Bhutta Cross-Examination.*  On cross-examination, Mr. Rosen walked Mr. Bhutta through Exhibit G, the Department of Buildings' printouts for the Permit and its history.  Tr. 109:4-16.  Mr. Bhutta confirmed that the initial 2017 filing for the Permit listed the architect's signature at the bottom of the application.  Tr. 109:17-110:7.  But when directed to the very next page, the ***renewal*** of that same permit, which extended it from its original April 2018 expiration to March 15, 2019, Mr. Bhutta was forced to concede that no architect of record appeared anywhere on the renewed application though Mr. Bhutta's name did.  Tr. 112:11-113:7.

Mr. Bhutta's account eroded further when Mr. Rosen turned to the timeline of his own outreach efforts.  Mr. Bhutta's emails reflected that his expediter attempted to renew the Permit online in February 2021, a step Mr. Bhutta would have had no reason to take had he genuinely believed, as he testified, that only the architect could act.  Tr. 156:9-17.  Mr. Bhutta was unable to explain why, if he believed all along that only the architect could renew the Permit, he waited until

13

several months after that failed attempt to first request the architect's contact information from the Debtor, in an email dated July 22, 2021, nearly a full year after the Settlement Agreement was signed. Tr. 123:5-124:11, 156:9-25. The record further reflected that Ap Tek's counsel did not substantively reach out to the architect until December 2021, some fourteen months after the Settlement Agreement was entered. Tr. 132:14-21.

Mr. Bhutta also acknowledged that he had personally been party to more than fifty permit renewals over the course of his career, yet had never once directly applied for a renewal himself; each time, he testified, the architect had done so using Mr. Bhutta's name and contractor tracking number. Tr. 141:9-12, 144:22-145:5. When asked to explain why the Settlement Agreement itself did not say that the architect, rather than Ap Tek, was responsible for renewing the Permit, Mr. Bhutta could offer no answer beyond stating that he had not raised the question with his own counsel at the time, though he acknowledged that he was represented by counsel in executing the Settlement Agreement and testified that he read and understood the Settlement Agreement before executing it. Tr. 145:13-19. When asked directly whether anyone had ever told him that an architect was the only person capable of renewing a permit, Mr. Bhutta answered simply: "No." Tr. 154:8-10. Finally, Mr. Bhutta admitted that he had never consulted the Department of Buildings' own published guidance on permit renewals, and that his belief that an architect's involvement was mandatory rested entirely on prior construction work (in other words his own informal practice, rather than any legal or regulatory requirement). Tr. 136:22-137:20. When Mr. Bhutta was asked to explain a provision in the Settlement Agreement that referenced a permit renewed by Ap Tek—"Specifically included is the permit that Claimant represented in court that it renewed but which actually lapsed"—Mr. Bhutta persisted that he had never renewed a permit and did not know anything about that language's inclusion. Tr. 147:19-149:16.

After a recess, Mr. Rosen called Seth Miller, the managing member of the Debtor, as his sole witness.

*Seth Miller Direct Examination.* Mr. Miller testified that he has served as managing member of the Debtor for approximately fifteen years. Tr. 176:16-25. Through Mr. Miller, the Debtor introduced business records comprised of fee estimates, invoices, proposals, and retainer agreements for a substitute expediter, plumber, and architect, documenting its efforts, following Ap Tek's prolonged inaction, to retain substitute professionals to complete what Ap Tek had failed to do. Tr. 180:15-183:23. Mr. Miller also testified, and the Debtor's business records confirmed, that the Debtor had promptly paid the prior architect of record, Mr. Leder-Luis, upon being notified of an outstanding invoice, cutting directly against Ap Tek's suggestion that the Debtor had left the architect unpaid and thereby caused his unresponsiveness. Tr. 177:4-179:17.

*Seth Miller Cross-Examination.* On cross-examination, Mr. Dahiya focused less on the substance of Mr. Miller's testimony than on his credibility and personal knowledge, attempting at one point to introduce evidence of an unrelated housing-code judgment against the Debtor, which the Court excluded as irrelevant to the narrow question of prevention of performance under the Settlement Agreement. Tr. 186:16-188:20. Mr. Dahiya established that Mr. Miller had not been personally present for Ap Tek's day-to-day work at the Property during the relevant construction period, and that Mr. Miller's knowledge of certain events came from the Debtor's business records and reports from the Operating Trustee and construction manager, rather than firsthand observation. Tr. 212:21-215:9.

The Court's own questioning of Mr. Miller, however, proved pivotal. The Court asked Mr. Miller whether Mr. Bhutta's testimony, namely that an architect is the only person who can ever apply for or renew a permit was consistent with Mr. Miller's own experience. Mr. Miller

15

answered: "Absolutely not." Tr. 221:14-21. Mr. Miller explained, based on his experience as a New York City property owner since 1994 who has owned twenty-five buildings and been "involved in permits and construction on more times than [he] can remember," that an architect is required to prepare and obtain an *original* permit application, but that renewing an already-issued permit is a categorically different and simpler act that can be performed by the party to whom the permit was issued—here, Ap Tek. Tr. 221:22-223:22. Mr. Miller drew a sharp distinction between *renewing* a permit, which requires no new plans, and *reopening* an expired permit past the statutory grace period, which he described as "starting from scratch," meaning new plans, a new plan examiner review, and, because code requirements may have changed, potentially an entirely different scope of required work. Tr. 222:8-223:22. Though Mr. Miller could not recall exactly how much time Ap Tek had under the Permit to act before the straightforward renewal process evolved into the burdensome reopening process, the Trial record later established that it was approximately six months. Tr. 27:14-22; Tr. 222:23-223:1.

The Court finds Mr. Miller's testimony on this point more credible than Mr. Bhutta's, as further set forth below, but in short because Mr. Miller's account was corroborated by the Debtor's own permit history in Exhibit O and Exhibit G, which showed that the Permit had in fact been renewed once before, in Mr. Bhutta's own name, with no architect listed on the renewal application, a fact Mr. Bhutta himself was forced to concede on cross-examination. Moreover, Mr. Miller's explanation of the distinction between renewal and reinstatement tracks the New York City Administrative Code (the "Code"). *See* N.Y.C. Admin. Code § 28-105.9.1.

## DISCUSSION

A settlement agreement is interpreted using "general principles of contract law," and where, as here, it is governed by New York law, its terms must be interpreted and enforced under

16

the principles of New York contract law. *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999). Where the terms of the agreement are clear and unambiguous, it must be enforced according to its plain meaning, and the Court must take care to not "alter or go beyond the express terms of the agreement," nor to "impose obligations" that are "not mandated by the unambiguous terms of the agreement itself." *Id.* Whether a contract is ambiguous is a question of law for the Court; a contract is unambiguous where its language has "a definite and precise meaning… concerning which there is no reasonable basis for a difference of opinion." *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.,* 595 F.3d 458, 467 (2d Cir. 2010) (citation and quotation omitted).

The parties agree that the key paragraphs in this Settlement Agreement are Paragraphs 2(c) and 2(b)(iv). By its plain language Paragraph 2(c) of the Settlement Agreement required Ap Tek to "fully cooperate" with the Reorganized Debtor by (i) "providing" "sign-offs," (ii) "providing" "authorizations on any open building permits..." and (iii) "providing" "any required extensions to those permits at no additional cost to the Reorganized Debtor" (except, in any event, the Reorganized Debtor was to pay renewal fees). Relevant here, the Settlement Agreement unambiguously required Ap Tek to "fully cooperate" "with the Reorganized Debtor" "in providing . . . any required extension to those permits at no additional cost to the Reorganized Debtor. . . ." Settlement Agreement ¶ 2(c). The Settlement Agreement thus placed the burden on Ap Tek to obtain any renewals, extensions, sign-offs, and authorizations necessary for all open building permits, which includes the Permit in dispute herein. Ap Tek's Post-Trial Mem. p. 1; Tr.7:24-9:9.

*Ap Tek's Breach*

Paragraph 2(b)(iv) of the Settlement Agreement governs the condition on the release of escrowed funds. In relevant part, that provision states that the escrowed funds "may be released

to [Ap Tek], except for $50,000.00 which shall remain in escrow pending issuance of the approvals of the work under the permit by DOB." Settlement Agreement ¶ 2(b)(iv). Taken together, Paragraphs 2(c) and 2(b)(iv) of the Settlement Agreement are facially clear that Ap Tek bore the responsibility to renew and close out the permits, and to secure the New York City Department of Buildings' (the "DOB") approval of the work. Thereafter, the escrowed funds of $50,000.00 were to be released only upon satisfaction of that condition. There is no contention from Ap Tek, nor can there be, that this condition was satisfied. Ap Tek plainly did not renew the Permit in question. The failure of Ap Tek to fulfill its obligation constituted a breach.

### *Ap Tek's Excuse*

Ap Tek does not dispute its failure to renew the Permit under the Settlement Agreement, upon which the release of escrowed funds is conditioned. Tr. 26:19-27:3. Instead, Ap Tek contends that its nonperformance is excused because the Debtor prevented it from performing. This contention is governed by the doctrine of prevention of performance, whereby a party (here, the Debtor) may not rely on another party's (here, Ap Tek's) failure to perform a condition precedent to discharge that party's obligations under a contract, where that party frustrated or prevented the occurrence of that condition. *Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc.*, 807 F. Supp. 1007, 1022 (S.D.N.Y. 1992). The doctrine invoked by Ap Tek excuses nonperformance of a condition "when a party wrongfully prevents that condition from occurring," resting on the "precept that…no person can rely on the…non-occurrence of a condition when [they] wrongfully prevented or caused it." *Id.* (citations and internal quotation marks omitted); *see Kooleraire Serv. & Installation Corp. v. Board of Educ. of City of N.Y.*, 28 N.Y.2d 101, 106 (1971).

Ap Tek's excuse rests on the premise that it could not have renewed the Permit on its own, as the renewal depended on the involvement of an architect, and it develops this premise in several

18

ways.   Principally, Ap Tek characterizes its obligations under the Settlement Agreement as "ministerial," claiming that renewal and sign-off paperwork could only be completed by the architect of record, an individual over whom Ap Tek had "no contract or authority" and, as such, Ap Tek's role was confined to solely signing, notarizing, and returning what was received.  Ap Tek's Post-Trial Mem. of Law p. 2-3; Tr. 199:23-200:3.  At Trial, Mr. Bhutta supported Ap Tek's contention, testifying that in his experience, "everything [was] done by the architect." Tr. 58:1, 80:17-81:10.  Ap Tek also asserts that, because the Permit included gas piping work that it had never performed (Tr. 60:2-12, 73:17-21), it could not obtain DOB sign-off on the permit on its own, as the New York City Administrative Code requires the design professional of record's presence at the final inspection of gas piping systems.  Ap Tek's Pre-Trial Mem. of Law p. 2-3 (citing N.Y.C. Admin. Code §§ 28-116.2.4.2, 28-116.2.4.3); Tr. 94:6-12.  Finally, Ap Tek claims that the architect of record was unresponsive due to the Debtor's failure to pay outstanding invoices, which it contends foreclosed its ability to renew or reopen the Permit.  Ap Tek's Post-Trial Mem. of Law p. 7-8 (citing Exhibits I, K, M).  The Debtor's eventual retention of a new architect "to redraw and resubmit the plans," per Ap Tek, confirms that an architect was always required for permit renewal.  Tr. 210:9-14; Ap Tek's Pre-Trial Mem. of Law p. 4.

Each of Ap Tek's contentions fails for the following reasons.  *First*, Ap Tek's argument that the New York City Administrative Code requires a design professional of record to obtain final sign-off is incorrect as a matter of law.  Under the New York City Administrative Code, an expired permit may be revived by the DOB, which may "reinstate a work permit within a period of two years from the date of issuance of the original permit." N.Y.C. Admin. Code § 28-105.9.1; *see* Exhibit P.[7]  Accordingly, as the Debtor correctly asserts and the evidence shows, the Permit

---

[7] While the text of the Administrative Code refers to the "date of issuance of the original permit," the record reflects that once a permit has been renewed, DOB practice ties the two-year reinstatement window to the most recent

could have been renewed by Ap Tek on its own had an application been made to the DOB two weeks prior to the deadline for permit revival (*i.e.*, March 15, 2021, two years after the expiration of the Permit).[8]  Tr. 27:14-22; Tr. 221:22-223:22.  This critical point is further supported by the facts evinced at Trial that though a design professional of record was included on the original permit, subsequent renewals did not include ***any*** information relating to a design professional of record.  *See* Exhibit O.  Here, the onus was on Ap Tek to procure a renewal of the operative Permit, not to re-open or obtain a new permit.  *See* Settlement Agreement ¶ 2(c).  Because the Court concludes that Ap Tek could have renewed the Permit without any architect's involvement during the relevant window (which was approximately six months following execution of the Settlement Agreement), and it is uncontested that no actions were taken in furtherance of renewal of the permit during that window, the parties' dispute over the cause and timing of the architect's unresponsiveness is immaterial to the outcome of this one.  This also answers Ap Tek's related contention that the Debtor's eventual retention of a new architect confirms that architectural involvement was always required: as the testimony established, the new architect became necessary only because the Permit had, by then, lapsed past the two-year window for straightforward renewal and so it cannot serve as evidence of what timely performance would have required.

Notably, there are certain instances where an architect may be necessary, such as when the permit's two-year "grace period" expires in full, which then requires a reinstatement of the permit. Then, as explained by Mr. Miller at Trial, while renewing a permit is straightforward, reopening a permit requires "starting from scratch."  Tr. 222:3-223:14.  In this scenario, the work under the

---

expiration date rather than to the original issuance date.  *See* Exhibit P.  Accordingly, the operative two-year deadline here ran from the Permit's expiration on March 15, 2019, not its original issuance on April 18, 2018.

[8] The application should have been filed by March 1, 2021, rather than March 15, 2021, because applications tend to need to be filed at least two weeks before the actual expiration date when done by mail.  Tr.27:20-22.

permit has to comply with all of the requirements of the Code in effect at the time application for reinstatement is made, such that the rules for the property may be very different, necessitating retention of design professionals to draw up new plans, to have those plans approved, etc. *Id.* This is undoubtedly a more onerous and expensive avenue to renewal. The evidence at Trial showed that the parties understood this reality and sought to avoid it. The original Permit was issued on April 18, 2018, and set to expire on March 15, 2019. Exhibit O. Accordingly, by the time the Settlement Agreement was so-ordered on August 31, 2020, the parties knew it had been expired for approximately seventeen months, leaving roughly six months to renew it without changes. *See* Settlement Agreement ¶ 2(c) (Ap Tek "shall fully cooperate with the Reorganized Debtor in providing 'sign-offs' and/or any and all authorizations on any open building permits with the New York City Department of Buildings" with this cooperation occurring "immediately.") The Reorganized Debtor protected itself by expressly stating the procurement of these sign-offs would be "at no additional cost to the Reorganized Debtor." *Id.*

Accordingly, the risk of waiting for the Permit to lapse beyond the two-year grace period and incurring the expensive procurement of starting from scratch was borne by Ap Tek. When applications for renewal of live permits have been submitted, a pending icon appears on the DOB website. In the ten months following entry into the Settlement Agreement, there were no pending permits visible on the DOB website. *See* Exhibit O. On July 22, 2021, Ap Tek asked the Debtor, for the first time, for the architect of record's contact information, but this was already more than ten months following entry into the Settlement Agreement. *See* Exhibit H. Therefore, the latter necessity of an architect after this period was a consequence of Ap Tek's delay, not of any conduct by the Debtor. Once the window for a renewal had closed, reviving the permit required amended plans, a design professional (*i.e.*, an architect) and updated compliance with the Code at that time.

21

As such, Ap Tek's nonperformance may not be deemed excused, as its lapse was a consequence of its own inaction.

*Second*, Ap Tek purports that sign-off on the Permit could not have been procured without an architect because it did not complete the gas piping work listed under the Permit. *See* Exhibit G p. 6. That claim is eroded by the distinction that the Code and the DOB website draw between a renewal or reinstatement *without* changes, and an amendment, or a renewal *with* changes. *Renewing Permits*, N.Y.C. Dep't of Bldgs., https://www.nyc.gov/site/buildings/industry/renewing-permits.page (last visited July 24, 2026); *see* Ex. P. Critically, a renewal without changes can be performed by the permit holder in isolation (*i.e.*, Ap Tek, the contractor of record); in contrast, a renewal with changes requires, at times, the signature and seal from "a professional engineer or registered architect."[9] *Id*. Ap Tek's insistence on the removal of gas piping work is hence an attempt to categorize the required renewal as one *with* changes, and therefore one which requires an architect's sign-off. Tr. 86:8-20; *see* Exhibit G p. 6. The Settlement Agreement solely required a permit renewal, not an amendment. While Ap Tek repeatedly alluded to the fact that Ap Tek did not perform the gas piping work listed under the relevant permit, it failed to show that in order to renew a permit, the general contractor must have done all of the work listed thereunder. *See* Tr. 42:1-8, 60:2-12, 73:17-21, 75:9-25. Ap Tek has offered no viable explanation of why an amendment was necessary and, given that effectuating the renewal was entirely in Ap Tek's control, the nonperformance is inexcusable.

---

[9] The Court notes that the Debtor's citations to N.Y.C. Admin. Code §§ 28-116.2.4.2 and 28-116.2.4.3, which require the presence of a registered design professional of record at final inspection of gas piping systems, are not to the contrary. Those provisions govern the final inspection and sign-off stage of the permitting process. A stage that Ap Tek never reached, because it failed to complete the antecedent step of renewing or reinstating the lapsed Permit in the first place. Whatever role a design professional might eventually have played at final inspection has no bearing on whether Ap Tek could have accomplished the renewal itself; the Court's holding concerns only the latter.

*Third*, Ap Tek appears to elevate Mr. Bhutta's subjective belief that he needed an architect to renew the Permit to a factual reality sufficient to excuse Ap Tek's nonperformance. Mr. Bhutta explained that, in his experience, when submitting permits, "everything [was] done by the architect." Tr. 58:1-2.[10] While it may be true that in Mr. Bhutta's ordinary practice the architect, or other design professional of record, working with him on a job actually moved through the DOB renewal process and Mr. Bhutta simply signed off on the final application, that belief cannot excuse Ap Tek's breach because the plain language of the Settlement Agreement placed the burden on Ap Tek to renew the permit. Further, the Settlement Agreement expressly referenced Ap Tek's prior representation in court of its attempt to renew a permit, notably without mention of a design professional of record's assistance in doing so. *See* Settlement Agreement ¶ 2(c). Mr. Bhutta testified he had read the Settlement Agreement before signing, understood it and asked no questions about how to proceed in the absence of an architect's assistance. Instead, Mr. Bhutta testified that his lawyer told him the contract was "everything is okay. Just sign it," and he signed it as drafted. Tr. 146:21-24. He then neglected to communicate in a timely manner with the Debtor to explain the situation or request the Debtor's assistance in reopening the Permit; the sparse correspondence in 2021 and again in 2024 was hardly sufficient to apprise the Debtor of the situation and adequately seek its cooperation. At a minimum, the testimony established that the Debtor could not have known of Ap Tek's misunderstanding of permit renewal rules until long after it became impossible for Ap Tek to renew the permit on its own.

---

[10] Mr. Bhutta's testimony regarding his subjective belief was also undercut by the record at Trial. Specifically, the record established that Ap Tek had permits where no design professional or architect is listed on the permit and Mr. Bhutta was aware of these permits because he ensured they were displayed at worksites. Tr. 113:1-11; Tr. 116:12-23; Ex. G. Second, Mr. Bhutta also engaged an expediter, not an architect, to attempt the renewal of the Permit, which tends to indicate he knew that a permit could conceivably be obtained without an architect. Tr. 155:11-25.

23

The doctrine of prevention of performance relied on by Ap Tek only excuses nonperformance when the counterparty's conduct prevented the occurrence of a condition; it does not excuse nonperformance caused by the breaching party's own inaction.  It was Ap Tek's failure to act within the renewal window, not any act or omission of the Debtor, that rendered the Permit expired and resulted in the need for a design professional.  While Ap Tek argues that the Debtor never paid any permit fee, it overlooks its own obligation antecedent to that permit fee ever coming due.  Ap Tek's Post-Trial Mem. of Law ¶ 30.  Ap Tek concedes that the Permit renewal fee, "the sole cost" the Settlement Agreement assigned to the Reorganized Debtor, was not the obstacle to performance, the absent architect was; yet, the evidence showed the architect's cooperation as not always necessary, and no attempts to renew the permit were made during that window.  Ap Tek's breach of Paragraph 2(c) of the Settlement Agreement is therefore not excused, and the escrow-release condition of Paragraph 2(b)(iv) of the Settlement Agreement remains unsatisfied.

## CONCLUSION

Accordingly, because Ap Tek has not performed under the Settlement Agreement, and failed to show at Trial that its nonperformance was the result of some impossibility or the fault of the Debtor, the Court holds that Ap Tek's breach of Paragraph 2(c) of the Settlement Agreement is not excused.  The condition precedent to release of the escrowed funds set forth in Paragraph 2(b)(iv) of the Settlement Agreement has therefore not been satisfied, and the $50,000.00 currently held in escrow shall revert to the Debtor.[11]  For the foregoing reasons, Ap Tek's Motion is **DENIED** in its entirety.

---

[11] The Court's holding herein resolves only the narrow issue of whether Ap Tek's nonperformance under Paragraph 2(c) of the Settlement Agreement was excused under the doctrine of prevention of performance, and whether the escrow-release condition of Paragraph 2(b)(iv) has been satisfied.  The Debtor's request for an affirmative money judgment for damages is reserved without prejudice, and the Debtor is free to pursue it by adversary proceeding, or otherwise, including in another available forum in the event a final decree has been issued or this matter has been dismissed, as applicable.

Date: <u>July 24, 2026</u>
New York, New York

/s/ *Shireen A. Barday*
**HONORABLE SHIREEN A. BARDAY**
**UNITED STATES BANKRUPTCY JUDGE**